The Judges delivered their opinions.
Judge Green.
On the 26th day of April, 1839, Brown, who resided in Rockingham, (and probably in the district of Ragan, a deputy Sheriff of that county,) bargained with the latter to assign to him certain bonds at a discount, and to give him a horse, and to pay him #800 in money; in consideration of which, Ragan was to satisfy an execution expected to issue, against Broion, and his sureties, Bird and Deary, from the Superior Court of Shenandoah, upon a suit then depending, against them, on behalf of the appellant. It was also agreed, that Ragan should have all the time for the payment of the debt, which could be procured by Brown’s giving and forfeiting a forthcoming bond. Brown accordingly, on the same day, assigned the bonds, delivered the horse, and paid the money to Ragan, according to their agreement.
A judgment was rendered in the suit of Norris v. Brown et ah, on the 26th of May, 1819, one month after this transaction between Brown and Ragan; upon which, an execution issued, which came to the hands of Ragan, a forthcoming bond was taken and returned by Hicks, (probably a sub-deputy Sheriff in the employment of Ragan. ) This bond was defective, and was quashed at the instance of Norris. On the 2d of November, 1819, a ca. sa. issued upon the judgment, directed by order of the plaintiff’s counsel, to the Sheriff of Rockingham, which Hoffman, a deputy Sheriff of Shenandoah, surreptitiously got possession of, in the expectation of finding Brown -and Bird, who resided in Rockingham, at Bushong’s sale, in that county, which was to take place in a few days; and to enable him to levy the execution upon all the defendants, he prevailed upon Deary, who lived in Frederick, to attend at Bushong’s sale, and to procure a prison-bounds bond to be executed; but, not finding Brown and Bird, *325 or either of them, at the sale, and not daring to levy the execution on Deary alono, in consequence of the manner in which ho had procured the execution, the prison-hounds bond was never delivered to him, nor did he arrest Deary. But, not to be wholly disappointed in securing the profit which he expected from levying the execution, he induced Deary to believe that he had rendered him an essential service, in the management of this execution; in consideration whereof, Deary executed to him his bond for $> 50, a sum nearly equivalent to what he would have received, if he had actually levied the execution, and the money liad been paid to the plaintiff; and, upon this bond, he instituted a suit against Deary.
The attorney of Norris, having reclaimed the execution from the hands of Hoffman, sent it to Ragan to be executed; who, thereupon, executed himself a forthcoming bond, which has also the names of Brown and Bird to it. But, how Brown’s name came to be signed to this bond, does not appear; he seems to have been, at the date of this bond, in Kentucky. This bond was presented by Hicks, (who, as aforesaid, was probably a sub-deputy Sheriff in the employment of Ragan,) to John Ragan, the brother of the deputy Sheriff, who also executed it. This bond bears date the 33d of November, 1819, and the appointed day of sale was the 31st of December, 1819. The execution and bond wore returned by James M. Bush, another deputy Sheriff of Rockingham. But, whether the execution was put into his hands before or after the return-day, does not appear, ft is probable, that he had no agency in levying or managing the execution, further than to endorse the return, at the request of Ragan; and that, in fact, the execution was never executed. Up&n this bond, execution was awarded on the 32d day of May, 1820, and issued on the 30th of May, 1820, and sent by the plaintiff’s attorney to the said James M. Bush to bo levied, with directions to levy on the property of the Ragans, and not on Brown’s for the present; the attorney having, *326 about that time for the first time, heard it intimated that j¿agan had, as deputy Sheriff, given his receipt for the amount of the execution to Brown, on or before the day appointed for the sale of the property by the forthcoming bond. This execution was levied according tp the attoi’ney’s instructions. Early in July, the attorney ascertained the existence of the receipt from Ragan to Brown. This bears date December 31st, 1819, but obviously was given at a later period; for, it expressly states, that the forthcoming bond was not present;—states the amount of the debt conjecturally and erroneously; and even mistakes the name of the creditor. The attorney having received this information, and read the receipt, called upon Ragan for the money, who said, that he had not the money-promised to pay @2,000 on the first of October—and begged indulgence; which the attorney refused to give, and told him to get the execution from Crouse, (a deputy Sheriff who had received the execution from Bush,) and by a proper return thereof, shew a disposition to do what he was in duty bound to do. The attorney, meeting with Crouse, and not knowing that the execution was levied, authorised him to deliver the execution to Ragan. This' is the statement of the attorney; but, Crouse testifies, that the attorney knew that the execution was levied, and positively directed him to deliver the execution to Ragan, which he did in the presence of the attorney. The proposition of Ragan, as to indulgence, does not seem to have been positively rejected by the attorney, Mien; but, he refused to give any indulgence, without the assent of his client. On the 20th of July, 1820, he saw Norris, and with his assent, wrote to Ragan to this effect: that Norris was willing to assent to Ragan’s proposal, “ which is, that you take the execution from Crouse, and return thereon, money made and ready to render, in your official character of Sheriff; that you are to pay @2,000, or the half of the whole amount, on the 1st of October next, or sooner, if received; and for the balance, to be indulged *327 until the 1st of July, 1821, if not paid before; so that, should there be any necessity for noticing the high Sheriff, in order to prevent you or his securities from taking any advantage of our indulgence, at the October or May term; yet, in no event is an execution to issue on the judgmeat on the notice, until after the 1st of June, 1821.”
“ The circumstance of the notice, should it be deemed necessary, is only to be viewed as a step of precaution, and not as a trap; for, if plighted words can bind, no execution shall issue ere the 1st of June, 1821.” “Get the execution from Crouse, and make the return.” Ragan accordingly made the return; and on the 24th of May, 1821, a judgment was rendered on that return against Ragan and his sureties.
Tt is not necessary to advert, particularly, to the circumstances under which this judgment was rendered, since, if the facts of the case would have enabled the sureties to defend themselves at law, they arc, notwithstanding they made no defence at law, clearly entitled to relief in equity, because they were not informed of the facts of the case in time to make their defence at law.
Upon this case, the Court of Chancery over-ruled a motion to dissolve an injunction which had been awarded upon the exhibition of the bill, upon the ground that Ragan was not liable as deputy Sheriff, to the payment of the amount of the execution to the plaintiff, he having made no money by virtue of the execution, which he returned “ money made and ready to render,” or of any other execution in the case; and that the return was false, and could not bind the sureties, it being made in consequence of a fraudulent combination between Ragan and the attorney for the plaintiff, to charge the sureties of Ragan with the debt. And, it is urged by the counsel of the appellees, that even if the return were true, the stipulation, on the part of the plaintiff, to give Ragan time for the payment of the money, would, in equity, discharge the sureties.
*328 I throw out of the case, all the matter which is doubtful, an(j consider it as if Hicks was not a sub-deputy in th.e employment of Ragan; which will render it unnecessary to encluireí whether Ragan and his sureties were responsible for Hicks’s .acts, and whether they would not be responsible for the debt, in consequence of his taking a faulty forthcoming bond, and how such liability might be effected by the subsequent transactions; and, as if the attorney for Norris had known that the last execution was levied on the property of the two Ragans, and had, notwithstanding, insisted on Crouse’s surrendering the execution to Ragan; and, as if the execution, upon which the last forthcoming bond was taken, had been levied by Bush, the forthcoming bond taken by him,'and the bond and execution remained in his hands from the date of the forthcoming bond, until they were returned; and, that the receipt dated December 31, 1819, was executed after the return-day of the execution, to'wit: the 31st day of January, 1821. , - •
In this view of the case, it is clear, that no money was made by Ragan, in his office of Sheriff, upon the first execution, which was quashed, or upon the second, upon which the forthcoming bond was given and forfeited, if the receipt, bearing date the 31st of December, 1819, was really executed by him' after the return-day of the execu- ' tion. For, the receipt of the consideration for which he . stipulated to pay Norris’s debt, imposed no obligation on him, in his official character, but only individually; and, in case of his failure to perform his contract, he was individually bound; and'his sureties, 'for the due execution of his office of Sheriff, could not, in that case, be responsible ■ either to Broum, or the plaintiff, until Ragan did some official act to bind himself, in respect to the funds placed in his hands by Brown, to account for them as Sheriff. He could not be bound as such, nor could his sureties, at the time he executed the receipt; there being no execution in the hands of any Sheriff of Rockingham, which gave *329 authority to any such to receive the money, he could do no act which could bind him officially, unless to return the execution, <£ready to satisfy.” The effect of such a return will be considered hereafter.
It is true, that a false return, produced by a fraudulent combination between the plaintiff and the deputy Sheriff, ought not to charge the high Sheriff, or the sureties of tho deputy. But, if a deputy Sheriff should, without fraud on the pari of the plaintiff, hut with fraudulent views of his own, malee a return which would preclude the plaintiff • from taking out another execution, he would violate the condition of his bond, which provides, that “ he shall, in all things, truly and faithfully execute and perform the said office of Sheriff,” and his sureties would he responsible. One of the duties of his office is, to make true returns; and if, in such case, the sureties were not responsible, then the plaintiff rriight lose his debt, by the default of the Sheriff without remedy„ It is, therefore, I presume, that the act of Assembly has made the Sheriff' and his sureties liable, not because of the fact of his having maxle the money upon an execution, hut because of his return that he has made it. Upon such a return, the high Sheriff would be bound to the creditor; for, it would be, in effect, his own return, by his deputy, which he could not controvert. He could not alledge the falsehood of the return, or tho fraud of his -deputy, in his defence, since that very fraud and falsehood had the effect of barring the remedy of the creditor against his original debtor. And If the high Sheriff be liable for any default of his deputy, the sureties are hound by the terms of their obligation to indemnify him. If, therefore, Ragan had made the return in question, without the knowledge or concurrence of the. plaintiff or his attorney (or, with their concurrence, and at their instance, if they believed it to be true, and were chargeable with no fraud,) for some fraudulent purpose of his own, even if it were confessedly false; it would have prevented the plaintiff from taking out any other ex *330 ecution on his judgment; and his sureties would have been bound for the debt to the high' Sheriff, if the plaintiff thought proper to resort to him, or otherwise, by force of the provisions of the act of Assembly, to the plaintiff; un- . ]esSj indeed, it could be said, that Ragan was incompetent to do any official act, in relation to an execution to which he was a party defendant; and that, therefore, such a return by him was merely void, and might and ought, for that cause, to have been quashed, so as to enable the plaintiff to take out another execution. I do not perceive any such incompetency. If the execution had come to the hands of the high Sheriff, nothing would have forbidden him to deliver it to Ragan, to be executed. There were other parties, out of whom the money might have been made, and ought to have been made, in justice, if Ragan had been, in fact, only a surety. At all events, the plaintiff could not complain that the high Sheriff, by his deputy, upon such an execution, had returned that the money was made. There would he no impropriety in the plaintiff’s delivering the execution to Ragan in the first instance; and, I have no doubt that this is the daily practice throughout the country. I can see no difference, as to the question of Ragan’s competency to act officially in relation to the execution, whether it was delivered to him by the plaintiff, or by the high Sheriff. Whatever act he did ' in relation to the execution, was, in point of law, the act of his principal, and not his act.
Before we come to the enquiry, whether Norris or his counsel are chargeable with any fraud in this transaction^ it is proper to ascertain whether, in fact, the return in question was true, or false and fraudulent.
As soon as Brown put funds in Ragan’s hands, in consideration of which Ragan promised to discharge Norris’s judgment, he became individually Brown’s debtor for that sum; and neither this, nor his subsequent failure to perform his contract, could have affected his sureties. But, as soon as he elected, acting in his office of Sheriff, to ap *331 ply his individual debt to Brown, in satisfaction of the execution in his hands, he performed his contract with Brown, and thenceforth was a debtor, as Sheriff, to Norris. If a Sheriff were to purchase property of a person against whom he had a Ji. fa. in his hands, to the amount of the execution, and agree to apply it in satisfaction of the execution, and did so, by returning the fact; or were to accept an order on a merchant, payable after the return? day, not-having levied the execution, and to return “ready to render,” or to accept any thing else in satisfaction, and made a like return; although, in these cases, lie would not literally have “made money” on the execution, yet lie would, in the language of the statute, have “levied the debt,” and he and his sureties would he responsible; and if so, then the Sheriff, being indebted to the defendant on any account, might take his own debt in satisfaction of the execution, return the fact, and bind himself officially, and, consequently, his sureties. The return was then true. The moment he assented to apply his debt to Brown, (having the execution in his hands as Sheriff,) in satisfaction of the execution, he “levied the debt,” and his return is conclusive proof of his assent. Nor does it appear to me, that this return was fraudulent. He liad actually received funds to the full amount of the debt, which he was hound in conscience to apply to its discharge. The sureties could be no more affected by this return, than if he had received those funds whilst the execution was in full force and in his hands, and applied them as ho did, to his own use; and no more than if Brown had deposited the full amount in money in his hands, before the execution issued, and after execution issued, he had, by Brown’s order, applied the money to the satisfaction of the execution, and afterwards applied it to his own use. His fraud consisted, as against the plaintiff, in entering into the original arrangement with Brown, with intent to appropriate the funds to his own use; and as against the plaintiff and *332 his sureties, in misapplying the funds, and not in making return.
But, if the return were false and fraudulent on the part aSalh was Norris or his counsel privy to the falsehood, or did they participate in the fraud ? Norris knew nothing of the transaction but from the information of his attorney, who assured him that the Sheriff and his sureties were already answerable for the debt; and in giving this assurance, the attorney acted conscientiously. He had delivered the execution of the 2d of November to Ragan. He had seen Ragan’s receipt for the amount of the execution, dated on the day the forthcoming bond would have been forfeited, if the money had not been paid, or the property produced. He might well have supposed, that the money, or some equivalent, was then duly paid, to a Sheriff authorised to receive it, although the execution was returned, and the forthcoming bond pui’ports to have been taken, by Bush. For, that might well have been done, and the execution been in the hands of Ragan, until the return-day; and, although the receipt states, that the forthcoming bond was not present when the receipt was given; yet, that might have happened, and the bond and execution might have been at Ragan’s house, or in the hands of his sub-deputy. This impression on Allen’s mind, was fortified by Ryan’s admission, that he had received the money officially, and was bound for it as Sheriff. If all this were false, it was the falsehood of Ragan; and if a deputy Sheriff, by false representations, induces a plaintiff to consent to a false return, which, if made without this concurrence of the latter, would bind the sureties of the former, the sureties cannot avail themselves of such assent, to discharge themselves from liability. If the fact had been as Ragan induced Allen to believe it was, and Ragan had duly received the money when authoriséd to do so, as Sheriff, Ragan’s sureties would have been bound, and, that even if the return on the subsequent *333 execution had been false, because no money was made on that execution. For, a Court of Equity would not restrain an execution on the judgment founded on that return; since the sureties, being bound otherwise than by that return, must have done equity before they could ask it. It is, therefore, that a Court of Equity permits even a judgment, obtained by fraud, to stand, as a security for any sum justly due. The time given to Ragan, on condition that he would make the return, does not indicate that the plaintiff or his counsel were conscious of doing any wrong to the sureties. They believed, and were induced to think-so by Ragan, that they were already bound. But, without the return, that liability, if it existed, could only be enforced by a tedious action; whereas, the return being made, a summary remedy might he had. It was for the sake of having this summary remedy, and not for that of charging the sureties otherwise than they were already chargeable, that this indulgence was given to Ragan. This object was perfectly fair and honest; for, if Ragan had received the money as Sheriff, he was bound, in law and justice, to make the return, and to give the summary remedy. The plaintiff only sought, what he believed that, by law a.nd equity ho was justly entitled to.
I, therefore, consider the return to be'neither false nor fraudulent; that if it were both, it would bind the sureties, unless the plaintiff or his attorney were privy to the falsehood, or participated in the fraud; that if the return was false and fraudulent, they were not privy to the one, nor participated in the other; and, that the injunction should be dissolved, unless the time given to the deputy Sheriff, for the payment of the money, absolved Ms sureties.
The long settled rule of Courts of Equity, and which has been adopted to its full extent in the Courts of Law, in England, is, that if a creditor, by agreement or any other act, precludes himself at law from proceeding against the principal, after the debt is due, for a moment; or, if the *334 agreement be such as would induce a Court of Equity to prohibit the creditor’s proceeding at law; the surety is discharged, because the creditor thereby inflicts an injury on surety5 and deprives him of the means of relieving himself, either by paying the debt and immediately proceeding against his principal, (for, in that case, he would be substituted in equity to the rights of the creditor; and, if the creditor had deprived himself by any act or agreement, of the right of proceeding immediately against the principal, this right of the surety would be impaired or frustrated;) or, by filing his bill quia timet, to compel the debtor to pay to the creditor, for the exoneration of the surety; in which case, if the creditor could not himself, in consequence of his own act or agreement, compel the principal to pay, neither could the surety, who, in such case, asserts the rights of the creditor for his own safety. And, in this case also, the rights of the surety would be impaired by the act of the creditor. But, if the act or agreement of the creditor is such, that he might, notwithstanding, proceed immediately against the principal, if required in writing by the surety, as the act of Assembly authorises; or might, upon the payment of the debt by the surety, substitute him to the right of proceeding immediately against the principal; or- the surety might, notwithstanding such act or agreement, proceed without impediment or delay, by his bill quia timet; then no injury has been done to the surety by the creditor, and there is no possible reason for absolving him. As judgment with a stay of execution entered of record, prevents the plaintiff at law from proceeding immediately, and absolves the surety, and an agreement to give time founded on valuable consideration, such as giving a new security, would be obligatory, and would be enforced in equity; such an agreement would also discharge the surety. But, an agreement without consideration, to give time to the principal, would be a nude pact, and could not be enforced at law or in equity, and the creditor could proceed immediately against the debtor, notwithstanding *335 such agreement, and in that case, none of the remedies of the surety would be impaired, and consequently, lie would not be discharged. So, if the creditor were to agree to give time to the principal, upon valuable consideration, and at the same time it Were agreed, that he might proceed immediately against the principal, if required by the surety; in that case, the rights and remedies of the surety would not be impaired, nor would he be absolved.
That the true ground upon which sureties are relieved in such cases is, that the creditor has impaired the remedies of the surety, by his act or agreement, appears decisively, from all the cases in England and Virginia, upon that subject; notwithstanding the loose and indefinite expressions sometimes used. Indeed, if this be not the true criterion, I can perceive none, but the arbitrary will of the Court in deciding each particular case.
Thus, in Nisbet v. Smith, 2 Bro. C. C. 579, the surety-called on the creditor to sue the principal, which he did, and took a confession of judgment, with a stay of execution for three years. This agreement was endorsed on the power of attorney to confess judgment. The original contract was merged in the judgment; so that, if the surety had paid the debt to the creditor, and he had ceded to the surety his rights, the latter could not have proceeded against the principal, until after three years; and so, if he had filed his bill quia timet, the principal could not have been compelled to pay, until after three years. The remedies, therefore, of the surety, were deeply impaired by this act of the creditor.
In Rees v. Barrington, 2 Ves. jun. 540, the creditor took new notes of the principal, giving further time for payment than that stipulated by the bond. The Chancellor said: “The surety has a right, the day after the bond is due, to come here, and insist upon its being put in suit. The obligee had suspended that till the time contained in the notes runs out. Therefore, he has disabled himself to do that equity to the surety, which he has a right to demand.
*336 In Samuel v. Howarth, 3 Merivale, 373, there was a contract to guarantee the payment for goods to be purchased by another, upon the usual credit. A note was given ^7 principal for the payment of the money, at the expiration of the credit; and, when due, was given up by the creditor, and another taken, payable at a further day. The guarantor was held to be discharged. The Chancellor, referring to the general rule, gave this reason for it: “that, in fact, the surety cannot have the same remedy against the principal, that he would have had under the original contract. ”
Skip v. Huey, &c. 3 Atk. 91, does not seem to come under this rule; for, there the principal professedly applied to the creditor, to give up the bond, and take new securities for the debt, for the purpose of discharging the surety; which was done. Some of the new securities proving of no value, the Court refused to subject the surety, the creditor being plaintiff.
In Peel v. Tatlock, 1 Bos. & Pull. 433, the whole Court concurred in refusing relief to the surety; and Bul= ier, Justice, said: “I do not see how the responsibility of the surety could be given up, since no favor shewn by the creditor to the principal, nor any thing done between them, which did not create an injury to the surety, could discharge the latter.”
In ex parte Gifford, 6 Ves. 809, and Boultbee v. Stubbs, 18 Ves. 20, it is admitted by the Chancellor, that if the creditor giving time, reserves his remedies against the principal or sureties, the latter are not discharged by giving time to the principal; for, in the latter case, it is equivalent to an agreement that the creditor may proceed at pleasure against the sureties, and thus throw them on the principal, notwithstanding the conditional indulgence given to him.
In Moore v. Bowmaker, 6 Taunton, 379, in an action of replevin; bond and security having been given by the plaintiff, for the return of the goods, the parties agreed to *337 m order of reference, and that no proceedings should he had in the replevin cause, pending the reference; relief was denied to the surety in the replevin bond; and Grans, Chief Justice, said, “ that the principles upon which Courts of .Equity had relieved sureties, were adopted in the Courts of Law, and applied to the case of bail. For, when the plaintiff has given time to the principal, the bail are put in a new situation: for, as the plaintiff could not, during that time, take the principal, so neither can the hail, whose right grows out of the plaintiff’s. 13ut, what is the present case ? Sureties in replevin cannot, at any time, take the goods of the plaintiff, and restore them to the avowant.”
These principles have been recognized here in Croughton v. Duval, 3 Call, 69. The surety sought relief, upon the ground, that the creditor had been requested by him to sue the principal, which he had refused to do. The Court denied the relief, whilst they recognized the authority of Rees v. Barrington, and Nisbet v. Smith.
In Ward v. Johnson, 6 Munf. 6, the majority of the Court inclined to think that the surety was discharged in equity; because, the act of the creditor “ had deprived him of his remedy, by bill quia timet. ”
In Hill v. Bull, Gilm. Rep. 149, the surety was relieved, because the act of the creditor had suspended the resort of the surety to his bill quia timet.
In Bennet v. Maule, Gilm. Rep. 328, Judge Roane considered the surety as discharged, because the creditor had “ opposed an impediment to his obtaining relief, by means of a bill quia timetj” and, in that case, Judge Coaltjok. said, (in which Judge Cabell concurred,) the only principle on which a surety can get relief, agreeable to the case made in the bill, is, that he has been deprived of his bill quia timet, by a contract between the creditor and princi pal, by which the creditor has tied his haiids;” and, considering that the surety might, in that case, have relieved himself by such a bill, denied relief
*338 In examining these cases, with a view to ascertain what ;s j}le settled principle upon this subject, at law, and in equity, it is not material to enquire, whether, in some instances, the rule may not have been applied to eases, to which it was not justly applicable. It is sufficient to know, that the sole ground of relief to sureties, in such cases, is settled, and avowed to be, that they have been deprived, by the act of the creditor, of a legal or equitable remedy for relieving themselves; or, that such remedy has been impaired by his act.
Our statute, which authorises sureties to call upon the creditor in writing, to proceed against the principal, and discharges the surety in case of the failure of the creditor ' to do so, excepts the cases of sureties to bonds, with collateral conditions, and the bonds of guardians, executors, administrators, and public officers. It may be said, that this exception does not affect the common law remedies of the surety; and that, in the cases excepted by the statute, a surety might still avail himself of his bill quia timet. This may be so; yet, it may be seriously questioned, whether a bill quia timet would lie in some cases. If it would, the consequences would be very extensive; one, for instance, that if a creditor took a judgment, with stay of execution, against an executor, his sureties would thereby be absolved; unless the remedies provided for sureties in that case, by the statute, obviated that effect.
It might, also be a serious question in this case, whether, as between Ragan and Norris, a Court of Equity would have enforced the agreement between them, if the consequence would be to discharge the sureties; or, even without regard to that consequence; and whether, in fact, the remedy of Norris was delayed or suspended. And, it might be another question, whether Norris did not reserve his remedies unimpaired, against the high Sheriff, although the consequence of pursuing that remedy might be, to subject Ragan to be proceeded against by the high Sheriff, before the time of the stipulated indulgence had expired. *339 It is not necessary to pursue these enquiries; since, I think, there is another view of the case which is decisive.
In general, the high Sheriff’ alone, and not the deputy, is responsible to persons injured by the official conduct of the latter. The deputy gives bond and security to the high Sheriff, for the performance of his duties, and for indemnifying his principal. Upon this bond, the party injured by the official misconduct of the deputy, has no remedy, unless expressly given by statute; and the remedy is then confined to the form prescribed by the statute. A remedy is so given in the case of a deputy Sheriff, returning that he has levied the debt, and in no other case. That remedy is by motion, and is given on the principle of substitution to the rights of the high Sheriff, arising out of the deputy’s bond to him. But, although this remedy is given, it does not take away the original remedy by action or motion against the high Sheriff. The party, therefore, retains an election to proceed against the one or the other, by motion. This is the construction given to the act of Assembly by the General Court, in Hogan v. Cottle, &c. (November, 1820,) and by this, in a case from Culpeper, not reported, and is the just construction. The words of the statute are, “if any Sheriff, under Sheriff, or other officer, shall make return, &c.” A return made by a deputy is the return of his principal, the Sheriff, and is made in his name; and such a return by the deputy, subjects his principal to the provisions of this statute. The 34th section of the act of 1819, provides that, “when any deputy sheriff now in office, or who may hereafter come into office, hath been, or shall be, found in arrears for any money, tobacco, or other thing received, or which ought to he received, by such deputy, by virtue of his office, and for which the principal, &c. is or may be chargeable, and shall not immediately pay or deliver the same to the person, &c. entitled thereto, the Sheriff may obtain such judgment, on motion, against the deputy, and his securities, as the principal» &c, might, by mo *340 tion, be liable to, on account of such arrears, &c., and have execution for • the same; unless the person entitled had already recovered against the deputy, or might there-afteri and before the motion of the high Sheriff, recover a judgment against the deputy.”
I have not used the precise words, but have stated the substance of the statute. For, the words “maybe” do not refer to the possibility or right of the party to recover judgment on motion, against the deputy, before the mo - tion of the high Sheriff but to an actual judgment thereafter obtained, before the motion of the high Sheriff. In the case of a .deputy Sheriff returning on an execution money made,” and not coming within the exception above stated, nothing could excuse him upon the motion of the high Sheriff, but the immediate payment of the money to the party entitled. It would be in vain for him to say, either that he had not made the money, for his official return would preclude such an allegation, or that the plaintiff had agreed to give time for the payment of the money. He would be answered, that the plaintiff could not deprive the high Sheriff, by any act. or agreement of his, of his legal right to call for, and enforce the payment to him of all money made by his deputies in their official character; that, he being bound ultimately to pay, if the deputy did not, had an immediate right to secure himself, by taking the fund into his own hands, and either pay it immediately; or elaim the stipulated indulgence, at his pleasure; and that, in effect, the agreement to give time was an agreement to give time to the high Sheriff.
If, then, the agreement in question were such as would, in an ordinary case of principal and surety, discharge the latter, yet, in this case, it would not, since it did not defeat or impair any remedy to which the sureties might have resorted for their relief. ' If the sureties had, immediately after the return, filed their bill quia timet against Ragan and Norris, Norris could not have been compelled to proceed against Ragan; for, the law had given him an *341 election to proceed, at his pleasure, against the high Sheriff or his deputy; and this election could not he taken from him, at the instance of the sureties; nor could ho have boon compelled to proceed against the high Sheriff, unless such a proceeding had been necessary for, or in some degree contributed to the safety or indemnification of the sureties. It was not necessary, nor could it have contributed to that end; for, the high Sheriff could have proceeded against Hagan, as well before as after he was proceeded against by Norris. And, if the sureties could have called upon the high Sheriff by bill of quia timet, to proceed against Vagan after judgment against the high Sheriff, they could do. so as effectually before such judgment. So that it was of no consequence to them, whether Norris proceeded against the high Sheriff or not. Notwithstanding this agreement, they might have had as effectual relief by a bill quia timet against the high Sheriff and Vagan, as if the agreement had not been made; and, if they had chosen to pay the money to the plaintiff or the high Sheriff, upon the return, they could, by substitution to the rights of the high Sheriff, have been as effectually relieved against Vagan, as if the agreement had not been made. For, as ho could not avail himself of the stipulated indulgence, as against the high Sheriff, neither could he against his sureties, asserting the rights of the high Sheriffj and substituted to them.
One other enquiry remains. It is insisted, that the plaintiff, by releasing the property of John and Daniel Vagan, taken in execution, did an injury to the sureties of the latter, by surrendering one of the securities which the plaintiff held for his debt; and that, upon the principle that the release by a creditor of any other security which operated for the benefit of the sureties, they are thereby put in a worse condition, and are therefore discharged. The sureties had not, before the release of this property, any interest in the question, whether the property should be released or not They were not, according to their *342 own allegations, then responsible as sureties for Norris’s ¿¡ebt. If they had, after the execution was levied and before the property was released, filed their bill quia timet enforce the sale for their indemnity, they could not have succeeded, because they were not then in any way liable for the debt. It was by the act of Ragan, subsequent to the release of the property, or cotemporaneous with it, electing, (by making the return which he did,) officially to hold his debt to Brown as a satisfaction of the execution, that their liability arose. They have no more interest in that transaction, than they had in the question, whether Daily was arrested under the execution, and discharged by the plaintiff. This, indeed, might, if it had occurred, have barred the plaintiff from taking out another execution, or acting further upon that. But, this could not be set up against him, by any other than those against whom the judgment was originally rendered. If they chose to waive this, or failed to avail themselves of it, and a Sheriff afterwards made the money on execution, his sureties could not defend themselves upon the plea, that if the party had not discharged the defendant, arrested on the ca. sa., he might thus have gotten satisfaction of his debt, and no responsibility could, in that case, have fallen upon them. When a Sheriff declares and returns that he has made the money, whether that be true or false, it can be no default in the creditor, as it relates to the sureties of the Sheriff, to discharge his original debtors.
Upon the whole, I think the order refusing to dissolve the injunction should be reversed, and the injunction dissolved.
Judge Coalter.
The contract which was entered into between Daniel Ragan, the deputy Sheriff, and Brown, was one which I think ought to meet with the disapprobation of every Court; especially as it provided for a course of proceed *343 ings on an execution which might eventually come to the hands of the deputy or his principal, or some other deputy Sheriff of the county, which, if not in strictness of law contrary to the truth of the case, at least held out great temptations to the substantial violation of his oath, and the duties of his office. The fact, that whenever the execution came to his hands, he would be interested in some slip being made, which would retard the recovery of this debt; that such slip was made, probably by his sub-deputy; and all the other circumstances of this case, make an ample commentary on this text.
Had he stipulated with Brown, that in case the execution should come to the county of Rockingham, and be placed in his hands, that he would return it “satisfied;” and when it did come to his hands, he had refused to make such return, when the money really was in his hands, paid to him in dischaige of the execution, though not paid after it came to his hands; and, if he could have found no property of Brown or Bird to levy it on, his conscience must have been asleep indeed, could he have made any other return on it than “satisfied.” Suppose, in such case, the creditor had known that Brown, being about to leave the country, had thus provided for the indemnity of his sureties, Bird and Deary, by an actual payment of the debt to the Sheriff making this return; could he not have denied its truth, and would not the Court either have compelled the Sheriff to amend his return, or have given a judgment against him, in the same way as if he had received the money, after the execution had come to his hands, and returned “ no property found ?” Suppose he had returned the truth of the case, that he had received the money before the execution came to his hands, under a promise, that if it did, he would return it “satisfied,” and then had the money in his hands, but elected to violate his agreement and leave the parties to their remedies against him as an individual, inasmuch as he did not wish to make either his principal or his sureties liable; I am *344 strongly inclined 'to think, that such return would not avaq him or them. Suppose Brown, about to leave the country, and not having time to see the creditor or his atForney, had so placed the money in the hands of the principal Sheriff, and he had returned the truth of the case, and that no property could be found, whereof to make the debt, would such return protect his sureties or him, from, a summary judgment ? I strongly incline to think not. Certainly if, in either case, the execution had been returned “ satisfied, ” it appears to me, that the sureties could not alledge, in a Court of Equity, that because the money was paid before the execution came to hand, they were not responsible. I think so, not only because the execution was in fact satisfied, but because a return was made, which precluded the creditor, for a-time, at least, from suing out another execution. For, suppose the sureties could after-wards procure a return of the truth of the case, and would thereby be relieved against the immediate effects of this return; yet, the return of “ satisfied” being false, as is now supposed, would have been an official act, for which the sureties would have been responsible; and, although a judgment might have been recovered against them on a false return, yet, being responsible on another ground, a Court of Equity would not relieve.
The case under consideration, in regard to the point now discussed, only differs from the one supposed, in this; that the Sheriff was not to return the first execution “satisfied,” but was to have the delay of a forthcoming bond; that is to say, although the debt was in reality paid, the Sheriff was not to return the truth of the case, but to proceed to levy and take a bond- as aforesaid. It appears to me, that this cannot strengthen the argument for the sureties. The entering into such contract was undoubtedly wi’ong, as aforesaid; but, was probably not such a violation of his duty, as would have subjected his sureties, had the execution never come to his hands; but, when it was delivered to him, we then mount a step higher. • He has *345 then the execution in his hands, and the money also to pay it; and, suppose the Court could wink, as he did, at the enormity that this payment was only to be applied to a subsequent execution, which might never come to his hands; yet surely he was bound to proceed legally and regularly with the execution then in hand. Say that neither he nor the Court are, in this stage of the business, to consider this as a discharge of the execution; then lie was bound at least to proceed legally to levy it. This he neither does himself, nor procures to be done. He was interested that a slip should be made. This was made, either through design, or from the negligence or ignorance of another deputy, who, it is allcdged, took the bond. His responsibility, and that of his sureties, began the moment the execution was put into his hands. At that time he held it, and the money for its discharge, under this contract. The contract, in connection with his official duly, now come into operation together. Suppose ho had received the money and bonds on speculation at that time, under an agreement with Brown, that he was to have the delay of a forthcoming bond. Would not this be a violation of his duty in limine, for which his sureties would have been liable? Suppose this had been done, when Brown was on his departure from Virginia, with abundant property liable to the execution, but instead of doing his duty in levying it, Brown, by giving him an advantageous speculation in bonds, obtains liberty to depart; the bond is forfeited, and on a new execution, all parties, deputy Sheriff and all, are insolvent; is this violation of duty not to be visited on his sureties ? The sureties on the delivery bond may have been good, hut have also left the State before execution on it; so that there was no violation of duty, in not taking a sufficient bond. Surely, it appears to me, his receiving a bribe, as it were, from the debtor, in order to.forego the lawful and plain line of his duty, however honestly he may have intended to pay the debt, cannot purge such transaction of its original impropriety, *346 This first fault is not purged by his afterwards taking a good bond, as it appears to me. I can see no essential difference between the two cases, nor am I satisfied that, in this stage of the business, either Ragan or his sureties could deny his responsibility to the creditor, as ¡Sheriff, even’if, by handing over the execution to another deputy, that deputy and his sureties had also become responsible.
But, be this as it may, had Ragan returned this execution, or the second one, “satisfied,” as probably he would have found himself bound to do, had he made the return on either, I think, for the reasons above stated, he and his sureties would have been bound to the creditor by that return. This wras not done; but, a new execution was issued, and put into his hand's, on which a forthcoming bond was taken, and another deputy returned it forfeited. The execution is issued on this forthcoming bond; it comes to the hands of Ragan, (no matter, at present, how;) and he being now bound by his contract, returns it “ satisfied in consequence of which return, a judgment was obtained against the sureties.
This was a just, and substantially a true return, as it regarded Norris, the creditor, and Brown, the debtoi\ It is an official act, and binds Raghn, and his sureties, to the creditor, unless he, or his attorney, in a way binding on him, has done something which, in equity, must discharge the sureties.
It is said that they have done acts, which, however intended, amount to a fraud on the sureties.
First; that this last execution was levied on property, from which the money might have been made, even out of Daniel Ragan himself; which property was released by the agreement, that Ragan might take the execution, and make this return.
Second; that, on this agreement, delay was stipulated for, and granted to Ragan; so that, had the sureties brought their bill quia timet, the hands of the creditor would have been tied.
*347 As to the first objection; it appears to me, that the fact that the execution was levied on property, which was then in the hands of the deputy Crouse, cannot vary the case from what it would have been, had the execution merely been in his hands. It would have bound the property of those against whom it issued, as much as if that property had been actually levied on; and, a discharge of this lien, if the defendants had property which was so bound, would have been an equal injury to the sureties. The seizure of that property only shews, to a certainty, that there was property bound, and that that property was within the power of the Sheriff; but, a. knowledge that the property was seized, is denied by the attorney of the creditor.
The question then recurs; was the assent of the creditor, that Crouse, if he thought proper, might deliver the execution to Hagan, that .he might return it “ satisfied,” either in fact or in law, a fraud on the sureties ? The execution on which the forthcoming bond had been taken, was, in the first instance, placed in the hands of Ragan. Ho had given a receipt, on the day that bond is ¿Hedged to have been forfeited, to the debtor Brown, for the amount of the money due. Daniel Ragan, and his brother, John Ragan, were sureties for Broion in this bond. The latter knew not of this fact, and so made no defence. The former did not, for reasons too manifest. An execution then was out against Brown, and John Ragan, (as to Daniel lie could not complain of it,) on a bond, which the creditor had a right to believe had not been forfeited; and the Sheriff who had received the money, and who ought to have returned the execution “ satisfied,” is now willing to do justice, and having the money in his hands, is desirous to return “satisfied,” as in substance was the truth of the case, on the execution in question. The creditor asserts that Crouse may place the execution in the hands of Ragan, in order that this return may be made. Suppose that he had known nothing about it, or, having *348 been informed that Ragan had received the money on the ¿ay 0f saiej had refused to interfere one. way or the other, and that Crouse had delivered the execution to Ragan, w^° ma^e return; could the sureties'have had relief on this ground, against the creditor? Surely not. Could they have had recourse against Crouse, because he, knowing the same fact, had put it in the power of Ragan to make this return, instead of levying the execution himself? Was he guilty of a breach of duty, for which an action could have been sustained on his official bond, for placing the execution in the hands of another deputy ? If this was a breach of duty, then Ragan had been twice guilty of a similar breach as to the preceding executions, for which he and his sureties were responsible. If it be said, that he placed those executions in the hands of other deputies to be acted on legally, but this was placed in Ms hands, in order to make a false return thereon, I answer, that this is assuming a fact which is denied. It is denied, that a Sheriff may not lawfully and justly return an execution “ satisfiedwithout levying it upon the property of the debtor, when he has money of that debtor in his hands, to the amount of the execution. True, if there is a fraudulent combination, to subject the sureties of an insolvent deputy Sheriff to the payment of the "debt, they may get relief; but, such fraud and combination must be shewn. If Crouse then might have lawfully handed over this execution to Ragan, having no interest that he should make a slip in the business, and without the imputation of any such interest, but bona fide, and to all appearance, an act of substantial justice to the debtor and his sureties, and to enable Ragan, as it were, to amend a former return, permitted, if not directed by him, to be made contrary to the truth of the case, I cannot perceive how the creditor can be injuriously .affected by assenting to such act of justice. It ought to .be shewn that he had some interest in, or some improper motive for, giving his assent.
*349 As to the second objection, I have not considered the question, whether the principles involved in it apply to the ease of sureties of Sheriffs, or to those of executors, &c. They seem to be excepted out of the act of Assembly giving a summary remedy to sureties, in the nature of a hill quia timet, and whether they were so excepted, because they do not properly fall within the doctrines on that subject, or it was thought best to leave them to the decisions of the Courts of Equity, to be adjudged according to the peculiar circumstances attending each case, is a question too important to be decided without full consideration.
But, admitting for the present, that the doctrines do apply in this case, I nevertheless think, first, that after the return was made by Ragan, the creditor, if his rights stood in the same condition, as if he had been totally ignorant of all these transactions, except what appeared on the record, and are not changed by his assent to the return, could not have been compelled to litigate the question, how far Brown, or John Ragan, were bound to pay this money, in exoneration of Daniel Ragan’s sureties. Those sureties would have an equal, or better right to litigate this matter, than the creditor. Nor would he have been bound to move to have his execution and this return quashed, so as to exonerate Ragan’s sureties, and re-issue his execution, unless, indeed, his rights, under that return, were impaired as aforesaid; but, if this be the case, the sureties have now a right to repel his claim against them, on that ground, independent of that now under consideration.
Secondly. They could only file their bill then, to compel him to proceed by motion, &c. against Ragan, so as to get judgment as soon as possible, in order to levy the execution on his property, or to give them a speedy recourse against him.
As to this; there was, in the first place, no stipulation which could prevent this, unless Ragan had paid the >> 2,000. But, if there was not time, and the $ 2,000 were not paid, this agreement to stay was without consideration. *350 The return on the execution, said to be the consideration received, was a favor granted to Ragan. It was to favor him and his sureties, that all this arrangement took place. The whole was understood to be a favor granted by, not one conferred on, the creditor, and depended on the other, deputy agreeing to give the execution to Ragan-. The creditor, as it regarded his interests, would have preferred to let the matter go on as it was.
As well on this ground, therefore, as because, viewing the whole tissue of misconduct now detailed in this case, of which the creditor was ignorant, as.well as the sureties, Ragan could not have opened his mouth, to say that the creditor was bound not to proceed, and that he must, consequently, lose his remedy against the sureties. The decree must be' reversed.
Judge Cabell.
There can be but one opinion as to the conduct of Daniel Ragan in the early stages of the transactions, disclosed ■ by this record. But, the fairness or' unfairness of his conduct, is an enquiry unimportant to the decision of the present case; nor is it material to ascertain whether he actually had an execution in his hands, at the time he gave the receipt bearing date the 31st December, 1819; nor whether the money for which, that receipt purports to have been given, was paid at that time, or at any antecedent period; nor even whether his sureties could, in any manner, be bound by that receipt. The execution which is the subject of the present controversy, was put into his hands, after that period; it being clearly proved that he had previously received, from the debtor, funds more than sufficient to discharge it. This execution he returned “money made and ready to render;” and the question now is, whether he and his sureties are liable for the amount of the execution, in consequence of that return.
*351 I do not think that a sound construction of the 48th sec^tion of the execution law, 1 R C. 542, 543, will permit the Sheriff or his sureties to controvert the truth of the return. That the Sheriff or other officer is estopped to deny the truth of his own return, is the most obvious result of general principles; and it seems to me equally clear, that tiie spirit of the act of Assembly will not permit the sureties of the Sheriff to controvert it; except, indeed, in the case of a falso return, procured by fraud in which the creditor participated. To make true returns on all process, is a duty which forms an important part of the condition of a Sheriff’s bond. The return, therefore, in this case, if false, was a violation of the condition of the bond; and it was injurious to the creditor, as it barred him from taking out and prosecuting another execution. If, then, a Sheriff makes a return, and the consequences of that return are about to be brought to bear, as in this case, upon him and his sureties, it would be strange, indeed, that his sureties, those who have bound themselves that all his returns shall be true, should be permitted to escape, by alledging that the return is false; by alledging that which of itself is a forfeiture of their bond, and an injury to the creditor. The words of the act of Assembly leave no doubt on the subject. It declares, that “if any Sheriff, &c., shall make return, &c., that he hath levied the debt, &e., it shall and may be lawful for the creditor, &c., to demand judgment against such Sheriff, &c., or the securities, &c., for the money, &c., or so much as shall be returned levied, thus making, as I conceive, the return, whether true or false, conclusive both on the officer and his sureties. Let us suppose, that a Sheriff receiving an execution against a man in whom he has great confidence, fails to levy it, but returns it satisfied, relying on the promise of the debtor to have the money forthcoming, before it will be required by the creditor. Can it be believed,' that the sureties would be allowed to say, in opposition to the return, that the money had not been received *352 by the Sheriff? If the Sheriff and his sureties would be bound by the return in such a case, much more ought they to be bound in the present case, where funds sufficient to discharge the debt, had been previously put into the hands 0f the Sheriff, on an agreement that he would discharge it. Although the conduct of Ragan, in many of the previous stages of this business, was most grossly fraudulent, yet I do not perceive either moral or legal impropriety in his returning this execution satisfied, under the attending circumstances. And, if it was not improper in him to make this return, it was, a fortiori, not improper in Allen to consent to that return; the more especially, as he then believed that the money had been received by Ragan at a time when the former execution was in his hands. And this is a sufficient answer to that part of the case of the appellees, which seeks relief from an ailedged fraudulent combination between Ragan, and Allen, the attorney for the creditor. There is not, in my opinion, the slightest foundation for such an imputation. Por, even if Ragan was actuated, in this stage of the proceedings, as in some of the former stages,- by a deliberate intention to commit a fraud, Allen did not participate in that intention. He did nothing which he had reason to believe was improper. If the fact had been, as Allen supposed, not only that the money had been actually paid to Ragan, but that he had given a receipt for it, at a time when the former execution was in his hands, it would have been right to discharge the property, and return the execution satisfied, as was done.
As to the pretension that the sureties are discharged by the time promised to Ragan, for payment, I have only to observe, that even if there was a sufficient consideration to support the agreement, yet the agreement to grant indulgence was a conditional one. It depended on a condition, which was to be performed before the creditor could make any motion against Ragan or his sureties; and, as that condition was not performed, the party was left to his *353 right of motion, in the same way, and to the same extent, as if the agreement had never been made.
I am of opinion to reverse the order of the Chancellor, and to dissolve the injunction.*

Judge Brooke, absent